## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE** | : | **Chapter 7** |
| | : | |
| **CHARLES LEWIS KAMPS, III,** | : | |
| | : | **Bankruptcy No. 15-17261-AMC** |
| **DEBTOR** | : | |
| ―――――――――――――――― | : | |
| | : | |
| **DOUGLAS HARRIS,** | : | |
| | : | |
| **PLAINTIFF** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **CHARLES LEWIS KAMPS, III,** | : | |
| | : | **Adv. Proc. No. 16-14-AMC** |
| **DEFENDANT** | : | |
| ―――――――――――――――― | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

# CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Facts and Procedural History ...................................................................................... 1

    A.      Independence Pointe Development Project ...................................................... 1

    B.      Anonymous Text Messages .............................................................................. 2

    C.      Defamatory Statements in Northeast Times Article ......................................... 3

    D.      Defamatory Statements to Former Employers of Harris .................................. 4

    E.      State Court Litigation ....................................................................................... 4

        1.      Seller Litigation .................................................................................... 4

        2.      Harris Litigation ................................................................................... 5

    F.      The Debtor's Bankruptcy .................................................................................. 6

III.    Discussion ................................................................................................................... 7

    A.      Rooker-Feldman Doctrine ................................................................................ 9

    B.      Collateral Estoppel ......................................................................................... 12

        1.      The Legal Standards Applied in the Harris Litigation Are Distinguishable from Those That This Court Must Apply to Determine Whether the Judgment Constitutes a Willful and Malicious Injury Under § 523(a)(6)  15

        2.      Collateral Estoppel Applies to the Jury's Factual Findings with Respect to Whether the Debtor Sent the Texts and Made False and Defamatory Statements ............................................................................................ 19

    C.      The Compensatory Damages Awarded to Harris in Connection with His Claim for Intentional Infliction of Emotional Distress and the Related Punitive Damages Award Are Nondischargeable Under § 523(a)(6) as Willful and Malicious Injuries ......................................................................................................... 21

        1.      Intentional Infliction of Emotional Distress ............................................. 21

        2.      Defamation .......................................................................................... 23

        3.      Breach of Contract .............................................................................. 26

        4.      Punitive Damages ................................................................................ 28

IV.     Conclusion ............................................................................................................... 30

## I.    INTRODUCTION

Prior to the Debtor's bankruptcy filing, a judgment in excess of $1 million was awarded by a jury in state court in favor of the plaintiff Douglas Harris ("Harris") and against the debtor/defendant Charles Lewis Kamps, III ("Debtor"), based upon certain claims sounding in tort and contract. Harris now seeks a determination under § 523(a)(6) that the judgment should be deemed nondischargeable.

As discussed below, the Court has determined that the only part of the judgment that constitutes a nondischargeable obligation under § 523(a)(6) relates to damages awarded for Harris' intentional infliction of emotional distress claim and the portion of punitive damages related to such claim. The remaining amount of the judgment will be discharged in the Debtor's bankruptcy.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Independence Pointe Development Project

In 2005, the Debtor was a limited partner in, and a principal of, Philadelphia Waterfront Partners, LP ("LP"), and a member of Philadelphia Waterfront Development LLC ("LLC"), which was the general partner of the LP. In October 2005, Harris, a lawyer, was retained by the LP to find investors for the development of a residential real estate project titled Independence Pointe ("Project") on real property located at 7777 State Road, Philadelphia, Pennsylvania ("Property").

Harris subsequently introduced Joseph Logue, Jr. ("Logue"), and Churchill Development Group, LLC ("Churchill"), a limited liability company owned by Logue, to the LP as potential investors for the Project. Tr. 153:1–154:8, ECF No. 34. On August 18, 2006, the Debtor, the other members in the LLC, and the other partners of the LP (collectively, the "Sellers") entered into a purchase agreement ("Agreement") with Logue and Churchill ("Buyers") whereby: (1) the

members of the LLC agreed to transfer 100% of their membership interests to the Buyers; (2) the

limited partners of the LP agreed to transfer 75% of their Class-C limited partnership interests to

the Buyers; and (3) Churchill ultimately would become the manager of the LLC and the general

partner of the LP. In exchange, the Buyers agreed to make certain payouts over time to the three

classes of investors in the LP. The Agreement also established various deadlines by which the

parties were required to accomplish certain goals in connection with the development of the

Project.

On September 8, 2006, Harris tendered his resignation to the Sellers pursuant to a retainer

agreement that he previously signed with the Sellers. Def.'s Post-Trial Mem. Ex. J, ECF No. 35.

Thereafter, Harris represented the Buyers in all of their transactions with the Sellers in

connection with the Project. Def.'s Post-Trial Mem. 15.

By the end of 2006, there was a dispute between the Buyers and Sellers under the

Agreement regarding whether the goals set forth in the Agreement had been timely met.

### B.    Anonymous Text Messages

Between January 2007 and March 2007, Harris received a series of anonymous text

messages ("Texts") on his phone through an anonymous text messaging service called AnonTxt.

Pl.'s Proposed Findings of Fact and Conclusions of Law 7, ECF No. 32. The Texts were crude,

offensive, harassing, threatening, violent, homophobic, anti-Semitic, and included death wishes

to Harris and his family.[1] *Id.* They also threatened Harris with disbarment and professional ethics

---

[1] The Court need not divulge the precise contents of each of the thirty-two Texts. It is enough to provide the following excerpts from a small sample of them. On January 30, 2007: "Fuck you you scrawny faggot jew bitch." February 1, 2007: "Hey douchebag your moms a whore your wifes a slut and you are a spineless prick. Die bitch die I hope you like it in the ass you fag." On February 2, 2007: "Good morning, and fuck you, your wife and children may death come to you all fucker." On February 18, 2007: "Fuck you, and your family. Hope you are worrying. You really are a little bitch, like your wife and your daughter." On February 19, 2007: "We celebrate this day for someone who did what was right. You have five days to pick the path that is right." On February 27, 2007: "Fuck

violations.[2] *Id.*

After receiving the Texts, "Harris felt compelled to install a security system in his home, fearing for the safety of his family . . . . sought therapy and was diagnosed with post-traumatic stress disorder . . . . [and] suffered weight loss and migraines." *Id.* Harris initially did not tell his wife about the Texts because he did not want her to "share his fear and anxiety." *Id.* At trial, Harris credibly testified that he was incredibly distraught and anxious after receiving these Texts and feared for the safety of his family and himself.

Harris went to the police and showed them the first twenty Texts that he received. Tr. 49:18–50:21. Thereafter, the police permitted him to transcribe and fax subsequent Texts to them. *Id.* at 50:15–21. Harris ultimately reported at least thirty-two Texts to the police and received possibly as many as fifty. *Id.* at 51:24–52:11.

### C.    Defamatory Statements in Northeast Times Article

After the dispute arose under the Agreement, the Debtor was interviewed by a reporter from the Northeast Times about the status of the Project. Def.'s Post-Trial Mem. 9. An article subsequently was published in the Northeast Times on February 15, 2007 ("Article"), wherein the Debtor was quoted as saying: "Our lawyer, Harris, got everyone comfortable with the deal as structured, encouraged [the LP] to sign the contract documents, then after the deal was signed, quit, went to work for Logue and then only processed the legal documents that protected his new partner . . . ." Debtor's Trial Ex. 6. Paraphrasing the Debtor, the Article also stated that Harris "failed to deliver key documents to an escrow agent that would have prevented Logue from

---

you and your family on this wonderful morning. Doug you are truly a pathetic piece of shit. Hope you can live with yourself you pathetic fuck." Def.'s Post-Trial Mem. Ex. A.

[2] On February 16, 2007: ". . . probation disbarred incarcerated . . . ." On February 17, 2007: "http://www. judiciary.state.nj.us/oae/grievancefrm.pdf." On February 21, 2007: "NJ lawyer disbarred sentenced to three years." On March 3, 2007: "[C]ontinue to work for Asswipe and get disbarred." Def.'s Post-Trial Mem. Ex. A.

pulling off the alleged scam," and that the LP was "considering filing criminal charges for fraud

and related charges." *Id.* The Article was later republished on a website maintained by the

Debtor's son, Todd Kamps ("Todd"). Def.'s Post-Trial Mem. 12.

### D.      Defamatory Statements to Former Employers of Harris

In March 2007, the Debtor also spoke to Harris' former employers, Michael Kaplan

("Kaplan") and Ronald Blumstein ("Blumstein"), who he knew through prior dealings in a

separate real estate development project, about the status of the Project. *Id.* at 17. During the

conversation, the Debtor told Kaplan and Blumstein that Harris stole client funds, worked on

"both sides of the fence" in connection with the Project, and was disloyal to him and the other

partners of the LP. Tr. 83:5–10. He also disparaged Harris' abilities as an attorney and intimated

that Harris was going to be disbarred. Pl.'s Findings 8.

### E.      State Court Litigation

#### 1.      Seller Litigation

In April 2007, the Sellers filed a complaint in the Philadelphia County Court of Common

Pleas ("CCP") against Harris and the Buyers in connection with the Project and the Agreement

("Seller Litigation"). *Id.* at 2. The Sellers asserted claims of fraudulent conveyance; fraudulent

inducement; breach of fiduciary duty; breach of contract; unjust enrichment; constructive trust;

and conspiracy. *Id.* In response, the Buyers filed counterclaims against the Sellers. *Id.*

On January 21, 2009, most of the Sellers' claims in the Seller Litigation were dismissed

on summary judgment, including their claims against Harris for fraudulent conveyance,

fraudulent inducement, and breach of fiduciary duty. *Id.* The Sellers later voluntarily withdrew

all of their remaining claims in the Seller Litigation. *Id.* On April 15, 2010, the CCP entered

judgment in favor of the Buyers in the Seller Litigation on their counterclaims. *Id.*

2.    Harris Litigation

On June 21, 2007, Harris filed a complaint in the CCP against the LP, the Sellers, and

Todd ("Harris Litigation"). *Id.* at 3. Harris asserted claims of, *inter alia*, intentional infliction of

emotional distress; libel; slander; conspiracy; and breach of contract. *Id.* He alleged that he

suffered severe emotional distress as a result of the Texts; that the Debtor's statements in the

Article and the Debtor's statements to Kaplan and Blumstein were false and defamatory; and that

the Sellers owed Harris unpaid attorney's fees.

In response, the Sellers filed counterclaims against Harris that were largely duplicative of

the claims that they had raised against him in the Seller Litigation. On January 26, 2009, those

counterclaims were dismissed on summary judgment for essentially the same reasons that they

were dismissed in the Seller Litigation. *Harris v. Philadelphia Waterfront Partners, L.P.*, Civ. A.

No. 02576, 2009 WL 8151572 (Pa. C.P. Jan. 26, 2009).

On July 16, 2010, after a trial on the merits, a jury issued a verdict in favor of Harris in

the Harris Litigation. *See generally* Compl. Ex. A, ECF No. 1 (setting forth the jury's

determinations). The jury found, *inter alia*, that: (1) the Debtor and Todd "intentionally or

recklessly" sent the Texts to Harris and that the Texts were extreme or outrageous; (2) Harris

suffered "severe emotional distress" as a result of receiving the Texts; (3) the Debtor made false

and defamatory statements about Harris which were published in the Article; (4) the Debtor and

Todd were responsible for republishing the Article on the internet; (5) the Debtor made false and

defamatory statements about Harris to Kaplan and Blumstein; (6) the Debtor and Todd conspired

to send the Texts; (7) the Debtor's conduct in sending the Texts or making the defamatory

statements was "malicious and willful"; and (8) the amounts due under certain promissory notes

("Notes") issued by the Sellers to Harris for attorney fees were due and payable. *Id.*

As a result of these findings, the jury awarded, *inter alia*, the following compensatory

- 5 -

damages in favor of Harris and against the Debtor: (1) $15,000 for the severe emotional distress

suffered by Harris as a result of receiving the Texts; (2) $75,000 for the false and defamatory

statements in the Article; (3) $50,000 for the false and defamatory statements made by the

Debtor to Kaplan and Blumstein about Harris; and (4) $356,486.03 for the Debtor's share of the

amount due under the Notes. The jury also awarded the following damages in favor of Harris and

against the Debtor and Todd, jointly and severally: (1) $25,000 for republishing the false and

defamatory statements in the Article; and (2) $500,000 in punitive damages for sending the Texts

and republishing the false and defamatory statements in the Article. *Id.*

Accordingly, on October 22, 2010, judgment was entered in favor of Harris and against

the Debtor in the total amount of $1,021,486.03 ("Judgment") and against Todd in the total

amount of $550,000.[3] *Id.* Todd and Harris subsequently entered into a confidential settlement

agreement whereby Todd made a payment in full satisfaction of the judgment entered against

him in the Harris Litigation. Pl.'s Findings 20. There was no settlement between the Debtor and

Harris.

### F.    The Debtor's Bankruptcy

On October 7, 2015, the Debtor filed a voluntary Chapter 7 bankruptcy petition in the

United States Bankruptcy Court for the Eastern District of Pennsylvania. On October 16, 2015,

Harris filed a proof of claim in the Debtor's bankruptcy in the amount of $1,021,486 on account

of the Judgment.

On January 14, 2016, Harris filed an adversary complaint ("Complaint") in the Debtor's

---

[3] In addition to the $25,000 of compensatory damages that the jury awarded jointly and severally against
the Debtor and Todd for republishing the false and defamatory statements and the $500,000 of punitive damages
that the jury awarded jointly and severally against the Debtor and Todd, the jury also awarded compensatory
damages in favor of Harris and against Todd in the amount of $25,000 for the severe emotional distress suffered by
Harris as a result of receiving the Texts. *See generally* Compl. Ex. A (setting forth the jury's determinations).

bankruptcy case pursuant to § 523(a)(6) in order to obtain a determination that the Judgment

against the Debtor was nondischargeable as a debt related to a willful and malicious injury.

Compl. ¶¶ 11–17. On May 17, 2016, Harris filed a motion for summary judgment ("Motion"),

essentially arguing that the Debtor was collaterally estopped from challenging any of the factual

findings and legal conclusions reached by the jury in the Harris Litigation. The Debtor opposed

the Motion. After an initial hearing on the Motion on June 29, 2016, the Court ordered the parties

to file supplemental briefing on the collateral estoppel issue.

On September 14, 2016, after a final hearing on the Motion, the Court denied the Motion

based upon its determination that the legal standards applied to establish the claims adjudicated

in the Harris Litigation were distinguishable from the legal standards necessary to make a

determination of nondischargeability under § 523(a)(6) of the Bankruptcy Code.

On November 30, 2016, the Court conducted a one-day trial in this adversary proceeding.

Both Harris and the Debtor testified. The parties subsequently filed proposed findings of fact and

conclusions of law and responsive briefs thereto.

## III.    DISCUSSION

The Debtor seeks a discharge of his debts under § 727(a). The Bankruptcy Code provides

debtors with the opportunity to "reorder their affairs, make peace with their creditors, and enjoy

'a new opportunity in life with a clear field for future effort, unhampered by the pressure and

discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). "A discharge granted under § 727(a) frees

the debtor from all debts existing at the commencement of the bankruptcy proceeding other than

obligations § 523 of the Code excepts from discharge." *Kontrick v. Ryan*, 540 U.S. 443, 447

(2004) (citing 11 U.S.C. § 727(b)). Section 727, therefore, is "the heart of the fresh start

provisions of the bankruptcy law." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).

Section 523(a) of the Bankruptcy Code, however, provides that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor" from certain categories of debts. 11 U.S.C. § 523(a). The burden to prove that a debt is nondischargeable under § 523(a) is "upon the creditor, who must establish entitlement to an exception by a preponderance of the evidence." *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995). Moreover, "[e]xceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." *Id.* at 1113.

Section 523(a)(6) provides that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."[4] 11 U.S.C. § 523(a)(6). Two distinct elements therefore comprise a willful and malicious injury.

"[A]ctions are willful and malicious within the meaning of § 523(a)(6) if they either have a purpose of producing injury or have a substantial certainty of producing injury." *In re Conte*, 33 F.3d 303, 307 (3d Cir. 1994). Merely because the Debtor's conduct may have had "a *high probability* of producing harm . . . does not establish that his conduct was *substantially certain* to produce [an] injury." *Id.* at 309 (emphasis added). "[D]ebts arising from recklessly or negligently inflicted injuries [therefore] do not fall within the compass of § 523(a)(6)." *In re Cunningham*, 541 B.R. 792, 803 (E.D. Pa. 2015) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998)).

With regard to the malice component, "no showing of specific malice is required" in order to satisfy this prong of the test. *Conte*, 33 F.3d at 308. To require specific malice would "place a nearly impossible burden on a creditor . . . . [and] restrict § 523(a)(6) to the small set of

---

[4] Under § 523(a), the Court initially must determine whether the creditor holds an enforceable obligation under nonbankruptcy law and then whether the debt is nondischargeable under bankruptcy law. *In re Sobol*, 545 B.R. 477, 490 (Bankr. M.D. Pa. 2016) (citing *In re August*, 448 B.R. 331, 346–47 (Bankr. E.D. Pa. 2011)). In this case, Harris plainly holds an enforceable obligation against the Debtor under nonbankruptcy law by virtue of the Judgment. The Court therefore will only address whether, and to what extent, the Judgment is nondischargeable.

- 8 -

cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor." *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009–10 (4th Cir. 1985)). Malice therefore encompasses an injury that is merely "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Mickletz*, 544 B.R. 804, 813 (Bankr. E.D. Pa. 2016) (quoting 4 *Collier on Bankruptcy* ¶ 523.12[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009)).

At the outset, Harris argues that the jury in the Harris Litigation already determined that the Debtor caused a willful and malicious injury to him and, therefore, that: (1) the Debtor is barred by the *Rooker-Feldman* doctrine from denying that the Judgment is nondischargeable; and (2) the Debtor is collaterally estopped from challenging the nondischargeability of the Judgment. Pl.'s Findings 11–14. The Debtor argues that the *Rooker-Feldman* doctrine is inapplicable and that collateral estoppel does not apply because the jury made "[n]o findings of fact, legal analysis or conclusions of law" in the Harris Litigation. Def.'s Post-Trial Mem. 3.

For the reasons discussed below, the Court concludes that the *Rooker-Feldman* doctrine does not apply here and that, although the Debtor is collaterally estopped from challenging certain factual findings made by the jury in the Harris Litigation, the Debtor is not collaterally estopped from challenging whether the debt associated with the Judgment was for a willful and malicious injury which is nondischargeable under § 523(a)(6). Ultimately, the Court concludes that only the $15,000 award of compensatory damages for Harris' intentional infliction of emotional distress claim and the related *pro rata* portion of the punitive damages attributable to the Debtor ($39,450) constitute willful and malicious injuries under § 523(a)(6) and are therefore nondischargeable.

### A.    Rooker-Feldman Doctrine

Harris argues that the Debtor's opposition to this nondischargeability proceeding

essentially constitutes relitigation of the issues adjudicated in the Harris Litigation in violation of

the *Rooker–Feldman* doctrine. Pl.'s Findings 12–14. Harris characterizes the Debtor as the "state

court 'loser' attempting to have this federal court review and reject or modify the judgements

against him." Pl.'s Reply to Def.'s Post-Trial Mem. 3, ECF No. 36. In response, the Debtor

argues that *Rooker–Feldman* is inapplicable because he "is not seeking to have the bankruptcy

court review the merits of the state court judgment." Def.'s Resp. to Pl.'s Post-Trial Mem. 22–

23, ECF No. 37. Rather, he only requests that the Court determine the dischargeability of the

Judgment under applicable bankruptcy law. *Id.*

 Under the *Rooker–Feldman* doctrine, lower federal courts, including bankruptcy courts,

"are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v.

Dennis*, 546 U.S. 459, 463 (2006); *In re Madera*, 586 F.3d 228, 232 (3d Cir. 2009).[5] However,

the doctrine is "narrow" and "confined to 'cases brought by state-court losers complaining of

injuries caused by state-court judgments rendered before the district court proceedings

commenced and inviting district court review and rejection of those judgments.'" *Lance*, 546

U.S. at 464 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

 The Third Circuit has articulated a four-part test to determine whether the *Rooker-

Feldman* doctrine applies: "(1) the federal plaintiff lost in state court; (2) the plaintiff

'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were

rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to

review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*,

---

 [5] In contrast, the Supreme Court possesses "exclusive" jurisdiction over appeals from final state-court
judgments. *Dennis*, 546 U.S. at 463 (citing 28 U.S.C. § 1257).

615 F.3d 159, 166 (3d Cir. 2010).[6] "The second and fourth requirements are the key to

determining whether a federal suit presents an independent, non-barred claim." *Id.*

In addition, the Third Circuit has recognized that "bankruptcy courts are empowered to

avoid state court judgments; to modify them; *and to discharge them.*" *In re Knapper*, 407 F.3d

573, 583 n.22 (3d Cir. 2005) (emphasis added) (citations omitted). Moreover, bankruptcy courts

have "exclusive statutory power to determine whether a debt is dischargeable in a bankruptcy

case," and "[a]ctions seeking a determination of nondischargeability are core bankruptcy

proceedings . . . and are not subject to the *Rooker–Feldman* doctrine." *Cunningham*, 541 B.R. at

800–01 (emphasis added) (citations omitted) (quoting *In re Sasson*, 424 F.3d 864, 871 (9th Cir.

2005)).

Based upon the foregoing, it is clear that the *Rooker-Feldman* doctrine does not deprive

bankruptcy courts of subject matter jurisdiction to determine nondischargeability proceedings, as

argued by Harris, because the Debtor does not seek a "review of the merits of the state court

judgment," but to "prevent the bankruptcy court from giving effect to the state court judgment."

*Id.* (quoting *Sasson*, 424 F.3d at 871).[7] Indeed, the Court notes that Harris cannot even satisfy the

---

[6] Harris relies upon outdated precedent in his discussion of the principles of the *Rooker-Feldman* doctrine. His discussion of the doctrine focuses on whether the claims presently before the court are "inextricably intertwined" with the Judgment entered by the CCP. Pl.'s Findings 12–14. However, this standard predates the Supreme Court's decisions in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), and *Lance v. Dennis*, 546 U.S. 459 (2006), in which the Court limited an overly broad application of the *Rooker-Feldman* doctrine by lower federal courts. Following *Exxon Mobile* and *Lance*, the Third Circuit clarified that "[t]he phrase 'inextricably intertwined . . . has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*.'" *Great W. Mining & Mineral*, 615 F.3d at 170. Although the "inextricably intertwined" precedent is "consistent" with *Exxon Mobil*, it should not be read to create an "additional legal test." *Id.* at 170 n.4.

[7] Harris mistakenly conflates the *Rooker-Feldman* doctrine with the doctrine of collateral estoppel. "[A]lthough there is substantial overlap between the *Rooker-Feldman* doctrine and collateral estoppel, the former is a rule of jurisdiction and the latter one of preclusion." *Cunningham*, 541 B.R. at 798–99; *see also Lance*, 546 U.S. at 466 (stating that the *Rooker Feldman* doctrine "is not simply preclusion by another name").

first prong of the test under the *Rooker-Feldman* doctrine because Harris, the plaintiff in this

case, did not lose in state court.

Based upon the foregoing, there is no basis for the Court to apply the *Rooker-Feldman*

doctrine in this proceeding.

### B.    Collateral Estoppel

The Court now turns to Harris' collateral estoppel argument. "The trial court has broad

discretion to determine if collateral estoppel should apply."[8] *In re Cunningham*, 526 B.R. 578,

583 (Bankr. E.D. Pa.) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)), *aff'd*,

541 B.R. 792 (E.D. Pa. 2015). "The party seeking to effectuate an estoppel," *i.e.*, Harris, "has the

burden of demonstrating the propriety of its application." *Suppan v. Dadonna*, 203 F.3d 228, 233

(3d Cir. 2000).

Under Pennsylvania state law,[9] collateral estoppel precludes the relitigation of an issue of

fact or law determined in a prior action if the following conditions are satisfied:

> (1) the issue decided in the prior case is identical to the one presented in the later
> action; (2) there was a final adjudication on the merits; (3) the party against whom
> the plea is asserted was a party or in privity with a party in the prior case; (4) the
> party or person privy to the party against whom the doctrine is asserted had a full
> and fair opportunity to litigate the issue in the prior proceeding; and (5) the
> determination in the prior proceeding was essential to the judgment.

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50–51 (Pa. 2005) (citing *Office of*

---

[8] The Debtor inexplicably and incorrectly argues that collateral estoppel does not apply in
nondischargeability proceedings in federal bankruptcy courts. *See In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997)
(citing *Grogan*, 498 U.S. at 284 n.11) ("The principles of collateral estoppel apply in discharge proceedings in
bankruptcy court.").

[9] "[A]s the prior forum is the Pennsylvania Court of Common Pleas for Philadelphia County, Pennsylvania
preclusion law applies." *Estate of Tyler* ex rel. *Floyd v. Grossman*, 108 F. Supp. 3d 279, 289 (E.D. Pa. 2015) (citing
*Heck v. Humphrey*, 512 U.S. 477, 480 n.2 (1994)).

*Disciplinary Counsel v. Duffield*, 644 A.2d 1186, 1189 (Pa. 1994)).[10] If the foregoing conditions are satisfied, the prior determination of the legal or factual issue is conclusive in a subsequent action, "whether on the same or a different claim." *Pennsylvania State Univ. v. Cty. of Centre*, 615 A.2d 303, 306 (Pa. 1992) (quoting Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)).

Here, there is no question that the previous action constitutes a final adjudication on the merits; that the Debtor was a party to that action; and that the Debtor had a full and fair opportunity to litigate the issues decided in that action. The Court therefore will turn to whether the issues decided by the jury were identical to the issues in this case and were essential to the Judgment.

An identity of issues "is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." *Suppan*, 203 F.3d at 233. To determine whether there is an identity of legal or factual issues in the Harris Litigation and this case, the Court therefore must compare the legal principles and essential factual findings underlying the Judgment to the legal principles and factual issues involved in making a nondischargeability determination under § 523(a)(6). *See Mickletz*, 544 B.R. at 815.

With the foregoing principles in mind, the Court will now examine the jury's legal and factual determinations in the Harris Litigation. Whether collateral estoppel applies "depends on the jury's assessment of the facts in light of the charges as presented at trial." *Bravo-Fernandez*

---

[10] While Pennsylvania state courts do not formally apply the fifth element, which asks whether the issue was essential to the determination in the prior case, the Third Circuit has stated that, "[w]hether there are four or five formal elements to the doctrine is not of consequence . . . . [because] the doctrine is essentially the same under either analysis." *Witkowski v. Welch*, 173 F.3d 192, 203 n.15 (3d Cir. 1999). Even if the fifth element is omitted, "[t]he identical issue must have been necessary to final judgment on the merits." *Id.* (quoting *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995)).

- 13 -

*v. United States*, 137 S. Ct. 352, 364 (2016) (quoting *United States v. Citron*, 853 F.2d 1055, 1061 (2d Cir. 1988)). The Court should "approach [this] task with 'realism and rationality,'" and "examine the trial record 'with an eye to all the circumstances of the proceedings.'" *Id.* (quoting *Ashe v. Swenson*, 397 U.S. 436, 444 (1970)).

Harris argues that the Court must conclude that the Judgment in its entirety (both the compensatory and punitive damages) is nondischargeable because the jury expressly determined that the Debtor's conduct was "willful and malicious . . . and awarded both compensatory and punitive damages as a result." Harris further argues that when compensatory and punitive damages "flow from one and the same course of conduct," both are nondischargeable under § 523(a)(6). Pl.'s Findings 14–15. In response, the Debtor argues that "[n]o findings of fact, legal analysis or conclusions of law" were made in the state court proceedings.[11] Def.'s Resp. 4.

As discussed below, the Court concludes that the legal standards underlying the Judgment are distinguishable from those applied to determine nondischargeability under § 523(a)(6). However, the Debtor is collaterally estopped from challenging certain factual findings made by the jury in the Harris Litigation. For instance, the jury found that the Debtor (a) actually sent some of the Texts; (b) conspired with Todd to send all of the Texts; (c) made false and defamatory statements about Harris in the Article which the Debtor republished on the internet; and (d) made false and defamatory statements about Harris to Harris' former employers.

Based upon the content of the Texts and the testimony given by the Debtor in this proceeding, the Court concludes that the injuries sustained by Harris as a result of the Texts

---

[11] Despite the Debtor's post-trial argument that no factual or legal findings were made in the Harris Litigation, the Debtor admitted in the Joint Pretrial Statement that "[t]here are no disputed facts in this matter as the jury in the state court proceeding made all findings of fact pertinent to this adversary proceeding and no new facts may now be presented." Joint Pretrial Statement § III, ECF No. 29.

- 14 -

constitute willful and malicious injuries under § 523(a)(6) and that the related compensatory

damages awarded in his favor against the Debtor, together with the related *pro rata* portion of

the punitive damages, are therefore nondischargeable.

> 1.  The Legal Standards Applied in the Harris Litigation Are Distinguishable from Those That This Court Must Apply to Determine Whether the Judgment Constitutes a Willful and Malicious Injury Under § 523(a)(6)

> *a.    Intentional Infliction of Emotional Distress*

Harris argues that the Debtor is collaterally estopped from challenging whether the jury's

award of $15,000 in compensatory damages for the severe emotional distress suffered by Harris

as a result of receiving the Texts is nondischargeable because "[b]ankruptcy courts typically hold

debts resulting from intentional torts, such as [this], to be nondischargeable." Pl.'s Findings 17.

As explained below, however, this argument fails because the legal standards used to determine

this tort under Pennsylvania law do not coincide with the legal standards used to determine

nondischargeability under § 523(a)(6).

In the Harris Litigation, the jury was asked to determine whether the Debtor

"intentionally *or recklessly* sent extreme or outrageous anonymous text messages to . . . Harris,

between January 2007 and March 2007." Pl.'s Findings Ex. A, at 145:15–20 (emphasis added).

The jury was also given the following instructions:

> A person who by extreme or outrageous conduct intentionally *or recklessly* causes severe emotional distress to another is subject to liability for that emotional distress and any bodily harm that results from the emotional distress.

> Extreme and outrageous conduct is that which goes beyond any possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

*Id.* at 146:4–13 (emphasis added). These jury instructions substantially conformed to the

definition of the tort of intentional infliction of emotional distress under Pennsylvania law. *See*

*Hoy v. Angelone*, 720 A.2d 745, 753–54 (Pa. 1998). The jury responded affirmatively that the

Debtor had "intentionally or recklessly sent extreme or outrageous anonymous text messages to .
. . Harris between January 2007 and March 2007." Compl. Ex. A, at 4:12–19.

As indicated in the jury instructions, the jury was permitted to premise its determination
of whether the Debtor's actions caused Harris to suffer severe emotional distress upon merely
*reckless* conduct. However, as discussed above, the determination of willful conduct under
§ 523(a)(6) must be based upon more than merely reckless conduct. Rather, it requires the
Debtor to have acted with the *intent* to injure Harris or, at the very least, to have acted with
substantial certainty of injuring Harris. Indeed, Harris admitted that "it is unclear whether the
jury found [that the Debtor] had intentionally rather than recklessly sent the extreme and
outrageous text messages." *See* Pl.'s Findings 16. Because the jury did not clearly find that the
Debtor acted with the requisite level of scienter needed to demonstrate willful conduct under
§ 523(a)(6), the legal determination that he intentionally inflicted emotional distress on Harris
has no bearing upon this Court's nondischargeability determination under § 523(a)(6).

      *b.*    *Defamation*

Harris also asserts that the Debtor is collaterally estopped from challenging whether the
following compensatory damages awarded in his favor in the state court for defamation are
nondischargeable under § 523(a)(6): (1) $75,000 for the false and defamatory statements made
by the Debtor about Harris in the Article; (2) $50,000 for the false and defamatory statements
made by the Debtor to Kaplan and Blumstein about Harris; and (3) $25,000 for the joint and
several liability of the Debtor and Todd for republishing the false and defamatory statements in
the Article on the internet (collectively, "Defamation Awards").

In order to state a claim for defamation under Pennsylvania law, a plaintiff must prove:
(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its
application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5)

the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. § 8343(a).

On the face of the statute, it is clear that there is no requirement that a defendant must *intend* to injure a plaintiff in order to establish a defamation claim under Pennsylvania law. Accordingly, the legal determination that the Debtor defamed Harris has no bearing upon this Court's determination as to whether the Defamation Awards are nondischargeable under § 523(a)(6).

Moreover, the Supreme Court has recognized an "oddity of tort law" which, in defamation actions involving private figure plaintiffs, permits compensatory damages to be awarded without providing proof of actual loss. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). Consistent with this, the jury was specifically instructed that "[i]f you find that any of the statements accused Mr. Harris of a crime or of doing criminal things, then that is defamatory per se." Pl.'s Findings Ex. A, at 152:20–23. Thus, the jury did not even find that Harris had actually been injured by the defamatory statements when it made the Defamation Awards. In contrast, in order to demonstrate a nondischargeable claim under § 523(a)(6), a plaintiff must be able to demonstrate that the plaintiff has sustained an actual injury. This inconsistency in legal standards provides an independent basis for the Court to conclude that the legal determination that the Debtor defamed Harris has no bearing upon this Court's determination as to whether the Defamation Awards are nondischargeable under § 523(a)(6).

### c.    *Punitive Damages*

Finally, Harris argues that the Debtor is collaterally estopped from challenging whether the jury's award of $500,000 in punitive damages is nondischargeable under § 523(a)(6) because the jury was given the following instructions:

- 17 -

Punitive Damages. Question 12: "Do you find that the conduct of [the Debtor] concerning the anonymous text messaging or any publication of defamatory information . . . was malicious and willful?" . . . .

. . . .

Finally, if you find that [the Debtor] acted willfully and maliciously, you are asked in Question 13: "State the amount of punitive damages you award."

If you decide that [the Debtor] acted maliciously and willfully, you may award punitive damages.

*Id.* at 153:2–21. The jury was also instructed that "[t]he purpose of punitive damages, and the

only purpose, is to punish a defendant for *outrageous conduct* and to deter that defendant and

others from doing the same or similar things . . . . A person's conduct is outrageous when it's

malicious, wanton, willful or oppressive, *or if it shows reckless indifference* to the interests of

others." *Id.* at 154:17–155:1 (emphasis added). Ultimately, the jury responded in the affirmative.

Compl. Ex. A, at 6:22–7:3.

The jury was separately instructed with respect to the "factors" to be considered in

determining the amount of punitive damages to award, and ultimately awarded punitive damages

to Harris and jointly and severally against the Debtor and Todd in the amount of $500,000.[12] *Id.*

at 7:2–8; Pl.'s Findings Ex. A, at 153:22–154:17.

The sole purpose of the jury's determination that the Debtor's conduct was willful and

malicious therefore was to determine whether to award punitive damages. Under Pennsylvania

state law, and as reflected in the jury instructions, "[p]unitive damages may be awarded for

conduct that is outrageous, because of the defendant's evil motive *or* his reckless indifference to

---

[12] The jury was instructed that "[i]n awarding an amount of money of punitive damages, you may consider the following factors: The character of what they did, the nature and extent of the harm to the plaintiff that they caused or intended to cause . . . . the plaintiff's trouble and expense in seeking to protect his interests and himself in legal proceedings . . . . [and] the wealth of the defendant as it is relevant to fixing an amount that will punish him and deter him and others." Pl.'s Findings Ex. A, at 153:22–154:11.

the rights of others." *Cunningham*, 541 B.R. at 803 (emphasis added) (quoting *Hutchinson* ex rel.

*Hutchinson v. Luddy*, 870 A.2d 766, 770 (Pa. 2005)). However, debts incurred pursuant to

reckless conduct clearly are *not* nondischargeable under § 523(a)(6). *Id.* (citing *Kawaauhau*, 523

U.S. at 64); *see also In re Braen*, 900 F.2d 621, 626 (3d Cir. 1990) (agreeing that "collateral

estoppel cannot preclude a debtor from contesting that he acted maliciously if the decision upon

which the estoppel claim is predicated required only proof of negligence or recklessness").

Harris argues that, despite use of the word "reckless" in the jury instructions regarding

punitive damages, "it is clear from the cumulative direct and circumstantial evidence that [the

Debtor] acted willfully." Pl.'s Findings 18–19. The facts established in the Harris Litigation

indeed may independently support a finding that the Debtor acted willfully and maliciously, and

the Court will address this question below. However, because the jury's award of punitive

damages may have been based on its determination that the Debtor acted with either an evil

motive *or* with reckless indifference, and because the trial record and other circumstances of the

proceedings do not clarify which standard the jury applied, the jury's award of punitive damages

cannot be dispositive of this Court's nondischargeability determination under § 523(a)(6).

      2.      <u>Collateral Estoppel Applies to the Jury's Factual Findings with Respect to
Whether the Debtor Sent the Texts and Made False and Defamatory
Statements</u>

Harris asserts that, pursuant to collateral estoppel, the following findings of fact made by

the jury in the Harris Litigation are binding upon the Debtor in this proceeding:

(1)     The Debtor "intentionally or recklessly sent extreme or outrageous
anonymous text messages to . . . Harris between January 2007 and
March 2007." Compl. Ex. A, at 4:12–19.

(2)     Harris "suffered severe emotional distress as a result of receiving
[the] anonymous text messages." *Id.* at 4:22–5:1.

(3)    "[F]alse and defamatory statements were published in an article in the Northeast Times on February 15, 2007," regarding Harris. *Id.* at 5:11–15.

(4)    The Debtor was "responsible for republishing" the false and defamatory statements on a website that the Debtor and Todd maintained. *Id.* at 5:21–6:1.

(5)    The Debtor's "statements to Michael Kaplan and Ronald Blumstein in March 2007 regarding . . . Harris were false and defamatory." *Id.* at 6:8–12.

(6)    The Debtor and Todd "conspired against . . . Harris to send anonymous text messages and republish the Northeast Times article." *Id.* at 6:17–21.

(7)    The Debtor's conduct, *i.e.*, "the anonymous text messaging or any publication of defamatory information . . . was malicious and willful." *Id.* at 6:22–7:3.

(8)    The Debtor was liable for both compensatory and punitive damages. *Id.* at 4:12–7:8.

Pl.'s Reply 1–2. Although the Debtor argues that "[n]o findings of fact, legal analysis or conclusions of law" were made in the state court proceedings, this argument is plainly belied by the record. Def.'s Resp. 4.

There is no question that the Debtor was a party in the Harris Litigation, there was a final adjudication on the merits of the litigation, and the determination of the Debtor's liability was essential to the Judgment entered against the Debtor. The Debtor clearly was afforded a full and fair opportunity to litigate whether he: (1) actually sent the Texts to Harris; (2) made false and defamatory statements about Harris in the Article ("Article Statements"); (3) made false and defamatory statements about Harris to Kaplan and Blumstein ("K&B Statements" and collectively with the Article Statements, the "Defamatory Statements"); and (4) republished the Article on the internet.

In the case at bar, the Debtor has asserted that he did not send any of the Texts, all of the

Defamatory Statements were actually true, and he did not republish the Article on the internet. However, these factual issues have already been determined by the jury in the Harris Litigation and they were essential to the Judgment entered against him in that proceeding.

In addition, these factual issues are identical to the factual issues which this Court must resolve in order to determine whether the injuries sustained by Harris in connection with the Texts and Defamatory Statements constitute willful and malicious injuries under § 523(a)(6). Collateral estoppel therefore precludes the Debtor from relitigating these factual findings in this proceeding.

### C. The Compensatory Damages Awarded to Harris in Connection with His Claim for Intentional Infliction of Emotional Distress and the Related Punitive Damages Award Are Nondischargeable Under § 523(a)(6) as Willful and Malicious Injuries

In light of the fact that the Court is bound by the jury's factual findings that the Debtor sent certain unspecified Texts, conspired with Todd to send all of the Texts, and made false and defamatory statements about Harris, the Court must now independently determine whether any of the injuries sustained by Harris in connection with these actions constitute willful and malicious injuries under § 523(a)(6).

### 1. Intentional Infliction of Emotional Distress

Harris argues that the $15,000 in damages awarded to him by the jury in the Harris Litigation in connection with his intentional infliction of emotional distress claim against the Debtor constitutes a willful and malicious injury under § 523(a)(6). Specifically, Harris argues that the Debtor sent the Texts with the intent, or at least a substantial certainty, of injuring Harris. In support of this argument, Harris points to the Debtor's "animosity towards Harris" exhibited by the Debtor's testimony at trial, and the "threatening, harassing, vulgar, and frightening" content of the Texts. Pl.'s Findings 16–17. Throughout much of the Debtor's briefs and

- 21 -

testimony, the Debtor responded by merely denying that he sent any of the Texts to Harris. As fully discussed above, of course, the Debtor is bound by collateral estoppel from disputing that he actually sent some of the Texts to Harris, and that he conspired with Todd to send all of the Texts to Harris.

Moreover, and in any event, the Court found that the Debtor's testimony regarding the Texts was not credible. Specifically, when forced to explain during cross-examination why some of the Texts were sent from IP addresses associated with the Debtor, he admitted that he actually sent Harris texts between January and March of 2007 using the same anonymous texting service that was used to send the offending Texts, purportedly because it was a free texting service. Tr. 31:10–32:8. However, he claimed that he always signed his name to his texts and did not send the Texts in question. Def.'s Post-Trial Mem. 18. In contrast, Harris credibly testified that he never received any texts signed by the Debtor through the anonymous texting service.

Turning to the content of the Texts, the Court finds that almost all of the Texts were incredibly vile, threatening, and offensive. Given their heinous content, it is incomprehensible that the Debtor could have sent, or conspired to send, the Texts without intending to injure Harris. At the very least, the Debtor must have known with substantial certainty that Harris would be injured by the Texts. The Court therefore concludes that the Debtor sent the Texts with the intent of injuring Harris, and that this is sufficient to constitute a willful injury under § 523(a)(6).

With regard to malice, based upon the heinous nature of the Texts, it is clear to the Court that the Debtor's delivery of some of the Texts, and conspiracy to send all of the Texts, was certainly "wrongful and without just cause or excuse." Accordingly, the Court holds that Harris has satisfied the "malice" prong under § 523(a)(6).

- 22 -

The Court therefore concludes that the Debtor's conduct in connection with sending, or conspiring to send, the Texts was willful and malicious under § 523(a)(6) and that his $15,000 debt to Harris in the Harris Litigation for his intentional infliction of emotional distress is nondischargeable.

### 2. Defamation

In the Harris Litigation, the Debtor was found liable to Harris for the following compensatory damages suffered by Harris as a result of the false and defamatory statements made by the Debtor about Harris: (1) $75,000 in damages for the Article Statements; (2) $25,000 in damages for the republication of the Article on the website that the Debtor maintained with Todd; and (3) $50,000 in damages for the K&B Statements. Compl. Ex. A, at 5:11–6:16.

As discussed above, pursuant to collateral estoppel, the Debtor is bound by the jury's factual findings that he actually made false and defamatory statements about Harris in the Article, republished the same, and made false and defamatory statements about Harris to Kaplan and Blumstein. As a result, the Court disregards the Debtor's extensive arguments and testimony related to whether these statements were actually true. However, as discussed below, the Court will consider whether, at the time these statements were made or republished, the Debtor *believed* that any of them were true, because that inquiry is relevant to establish the requisite malice under § 523(a)(6).

As discussed above, in order to prove that the Debtor willfully injured him in connection with the defamatory statements, Harris must show that the Debtor made, or republished, a defamatory statement "with the purpose of producing injury or . . . with substantial certainty of producing injury." *In re Conte*, 33 F.3d 303, 307 (3d Cir. 1994). A strong probability that harm may result is not enough to establish a willful injury under § 523(a)(6). *Id.* Mere negligence or recklessness likewise will not establish a willful injury. *In re Malloy*, Civ. A. No. 15-5046, 2016

- 23 -

WL 2755593, at *7 (E.D. Pa. May 11, 2016) (quoting *Kawaauhau*, 523 U.S. at 63–64).

Harris argues that the statements made by the Debtor about Harris in the Article and to

Kaplan and Blumstein were willful and malicious because:

> The article suggests that Harris, in his role as an attorney to the parties, was involved in criminal behavior and assisting the perpetration of a "scam." It is therefore clear that the article's intent was to harm [his] reputation, and this conduct was wrongful, and without just cause or excuse.
>
> Additionally, the statements regarding Harris that [the Debtor] made to Michael Kaplan and Ronald Blumstein . . . [that] Harris was engaged in criminal behavior, was a thief, and would be disbarred. . . . [were] said to Harris' former employers, and [were] clearly intended to harm his personal and professional reputation. In the very least, saying such things about a professional certainly has the substantial certainty of causing harm.

Pl.'s Findings 17–18. Essentially, Harris asserts that the Debtor's statements were intended, or

substantially certain, to injure Harris because their contents disparaged his professional

reputation, and the recipients of the statements were his past, present, and potential clients and

employers.

In response, the Debtor argues that the statements were not intended to harm Harris.

Rather, he asserts that they were intended to "salvage [his own] reputation and the reputation of

his partners while the largest redevelopment project in Philadelphia's recent history was souring

through no fault of their own." Def.'s Post-Trial Mem. 10. Likewise, the Debtor asserts that the

statements directed at Kaplan and Blumstein, with whom he "had established a good relationship

. . . through their [prior] business activities together as partners," were intended to warn them that

Harris "had gone rogue." *Id.* at 17–18.

The Debtor credibly testified that, in making or republishing the defamatory statements

about Harris, his primary intent was to defend his and his partners' reputations and to protect

others. In contrast, Harris has failed to present any evidence that the Debtor's statements were

*intended*, or *substantially certain*, to injure Harris, other than weak inferences based upon the

- 24 -

contents of the statements. The Court finds, and concludes, that, in making and republishing the

offending statements, the Debtor acted recklessly. He should have realized that his defamatory

statements could have injured Harris. Since reckless acts do not rise to the level of intentional

behavior required under § 523(a)(6), however, the Court concludes that the Debtor did not act

with the requisite willfulness to cause injury required under this provision of the Bankruptcy

Code.

Although it is not necessary for the Court to consider any other factors under § 523(a)(6)

in connection with the defamatory statements, the Court notes that Harris has failed to present

the Court with any evidence that he actually has been injured by any of the defamatory

statements made or republished by the Debtor. Thus, in the absence of any evidence of an injury,

the Court is also compelled to conclude that Harris has failed to satisfy his burden under

§ 523(a)(6).

Finally, the Court notes that Harris has failed to demonstrate that the Debtor acted

maliciously in making, or republishing, the defamatory statements because, in order to prove

malice, he was required to show that the Debtor made the statements with knowledge of their

falsity at the time that they were made. *See In re Faller*, 547 B.R. 766, 771–72 (Bankr. W.D. Ky.

2016) (stating that courts "have held that a defamatory statement is not 'malicious' unless the

debtor knew the statement was false when he made it"). Essentially, if a debtor actually believes

that his or her defamatory statements are true at the time that they are made, then the debtor

cannot have acted with the requisite maliciousness under § 523(a)(6) because the debtor

necessarily did not act wrongfully or "without just cause or excuse." *Id.* (stating that "[a] debtor

does not act in '*conscious* disregard of [his] duties,'" under § 523(a)(6), "in making a defamatory

statement that he may actually believe is true").

- 25 -

The Debtor credibly testified at trial that, not only did he believe that the defamatory statements that he made, or republished, about Harris were true at the time that they were made or republished, but that he *still* believes that they are true. As a result, Harris has failed to establish that the Debtor maliciously caused him any injury in connection with the defamation claims and, therefore, Harris' § 523(a)(6) nondischargeability claim against the Debtor related to the defamation claims fails for this reason as well.

### 3.    Breach of Contract

Harris also asserts that the $356,486.03 in damages awarded for his breach of contract claim against the Debtor should be held to be nondischargeable under § 523(a)(6). Pl.'s Findings 4. In response, the Debtor counters that Harris presented no evidence that the breach was willful or malicious. Def.'s Post-Trial Mem. 13.

A number of courts have held that § 523(a)(6) does not apply to damages incurred in connection with a simple breach of contract and that such damages can only be rendered nondischargeable under § 523(a)(6) to the extent that such breach was accompanied by tortious conduct. *See In re Grasso*, 497 B.R. 434, 445 (Bankr. E.D. Pa. 2013) (holding that "a creditor's demonstration that a debtor breached a contract is not sufficient to render nondischargeable the creditor's claim arising from that breach"); *In re Glenn*, Bankr. No. 1:11-bk-02164MDF, Adv. No. 1:11-ap-00324MDF, 2012 WL 3775977, at *3 (Bankr. M.D. Pa. Aug. 28, 2012) (holding that the debt incurred by the debtors in connection with their failure to pay their mortgage was nondischargeable because the debtors were also found to have intentionally damaged the real property, which secured the creditor's lien, by taking out fixtures when they vacated the real property); *In re Jacobs*, 381 B.R. 128, 138 (Bankr. E.D. Pa. 2008) (holding that "§ 523(a)(6) is not intended to render nondischargeable debts arising from simple breaches of contract").

Many of these courts have come to this conclusion based upon the Supreme Court's

- 26 -

recognition in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), that expanding the "willful" element in

§ 523(a)(6) to cover breaches of contract would be "so broad [that it] would be incompatible

with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly

expressed.'" 523 U.S. at 62.[13]

In addition, other courts have come to this conclusion based upon one or more of the

following reasons:

> (1) the terms "willful and malicious" have traditionally been used in the context of tort law not contract law; (2) the precursor to Section 523(a)(6) in the Bankruptcy Act of 1898 was generally applied only in situations of tortious conduct and Congress should be presumed to have intended to continue that practice when it chose to use the same terms in the 1978 Bankruptcy Code; (3) exceptions to discharge should be construed narrowly; (4) a policy of making intentional breaches of contract non-dischargeable is inconsistent with the policy behind Section 365(a) which authorizes a debtor in possession to reject executory contracts; (5) the potential for a breach of contract and the ensuing economic damage is foreseeable by both contracting parties; and (6) making damages for breach of contract non-dischargeable whenever the breach was foreseeable would vastly decrease the number of dischargeable debts.

*In re Snyder*, 542 B.R. 429, 444 (Bankr. N.D. Ill. 2015).

Based upon the foregoing, it is clear that Harris' simple breach of contract claim could

not constitute a willful and malicious injury under § 523(a)(6).[14] During the Harris Litigation and

---

[13] *See also Lockerby v. Sierra*, 535 F.3d 1038, 1042 (9th Cir. 2008) ("Expanding the scope of § 523(a)(6) to include contracts that are intentionally breached whenever it is substantially certain that injury will occur would severely circumscribe the ability of debtors to 'start afresh.'"); *In re Best*, 109 F. App'x 1, 8 (6th Cir. 2004) ("Consistent with *Geiger*, we have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)."); *In re Flakker*, Bankr. No. 14-00340, Adv. No. 14-10037, 2015 WL 4624545, at *4 (Bankr. D.D.C. Aug. 3, 2015) ("The plaintiff's breach of contract claim is insufficient, on its own, to state a nondischargeability claim under § 523(a)(6), but coupled with the plaintiff's allegations of fraud, the allegations of breach of contract adequately allege a nondischargeability claim under § 523(a)(6)."); *In re Iberg*, 395 B.R. 83, 89 (Bankr. E.D. Ark. 2008) ("[I]t is a well-settled principle of law that 'a simple breach of contract is not the type of injury addressed by § 523(a)(6).'").

[14] *See In re Crawford*, 476 B.R. 890, 898 (Bankr. W.D. Pa. 2012) (applying the rule that a claim for breach of contract "does not constitute an intentional tort and thus does not establish willful and malicious injury"); *In re Coley*, 433 B.R. 476, 499 (Bankr. E.D. Pa. 2010) (stating that "[a]n intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful tortious conduct").

in this adversary proceeding, there was no allegation or evidence that the Debtor engaged in any

tortious conduct in connection with his failure to pay the underlying note.[15] Therefore, Harris has

failed to demonstrate that the damages related to his breach of contract claim against the Debtor

are nondischargeable under § 523(a)(6).

4.    <u>Punitive Damages</u>

The jury in the Harris Litigation awarded Harris a total of $500,000 in punitive damages

and found the Debtor and Todd jointly and severally liable. The award was based upon their

conduct related to the Texts and the Defamatory Statements. However, the jury did not

separately allocate the punitive damages as between the Texts and the Defamatory Statements.

*See* Compl. Ex. A, at 6:22–7:8 (awarding, but not allocating, punitive damages for the

defendants' conduct "concerning the anonymous text messaging or any publication of

defamatory information").

This is problematic because only the portion of the punitive damages related to the

Debtor's delivery of the Texts, which flow from the same source of conduct underlying the

nondischargeable compensatory damages for the intentional infliction of emotional distress

claim, is nondischargeable under § 523(a)(6). *See In re Marks*, 192 B.R. 379, 387 (E.D. Pa.

1996) (quoting *Coen v. Zick*, 458 F.2d 326, 329–30 (9th Cir. 1972)) (stating that when "both

punitive and compensatory damages flow from one and the same course of conduct," both may

be nondischargeable under § 523(a)(6)), *aff'd*, 106 F.3d 386 (3d Cir. 1996). The punitive

damages related to the Defamatory Statements, which flow from the same source of conduct

underlying the dischargeable compensatory damages for the defamation claims, are

---

[15] In the Harris Litigation, the jury was instructed to decide only whether "the sums owed under the promissory notes [are] due." Compl. Ex. A, at 4:9–11; Pl.'s Findings Ex. A, at 144:15–19.

- 28 -

dischargeable, as discussed above.

The Court therefore must decide which part, if any, of the $500,000 punitive damages

award related to the Texts and should be held to be nondischargeable under § 523(a)(6). Courts

have recognized that, where a single amount of damages is awarded for multiple claims, some of

which are dischargeable and some of which are nondischargeable, "there should be a mechanism

to separate the dischargeable debt from the nondischargeable debt." [16] *In re Kates*, 485 B.R. 86,

111 (Bankr. E.D. Pa. 2012). In this case, it is plainly within the Court's equitable powers and

discretion to determine the proper allocation of the punitive damages.

The Court concludes that the appropriate portion of the punitive damages associated with

the nondischargeable claim against the Debtor for the intentional infliction of emotional distress

shall be determined by: (1) calculating a percentage where: (a) the numerator is the amount of

compensatory damages awarded to Harris for the Debtor's intentional infliction of emotional

distress related to the Texts; and (b) the denominator is the total amount of compensatory

damages awarded to Harris against either, or both, the Debtor and Todd for the Texts and the

Defamatory Statements; and (2) multiplying such percentage by the $500,000 punitive damages

award. [17] This appears to be the only fair and equitable mechanism to separate the Debtor's

---

[16] *See also In re Shahverdi*, BAP No. CC-12-1287-MkTaPa, 2013 WL 2466862, at *15–16 (B.A.P. 9th Cir. June 7, 2013) (remanding to the bankruptcy court to allocate damages awarded in arbitration between dischargeable and nondischargeable claims where the arbitrator "fail[ed] to disaggregate and distinguish the factual findings which lead to nondischargeable debt from those . . . factual findings which lead to dischargeable debt"); *Spagnuolo v. Brooke-Petit*, 506 B.R. 1, 7–8 (D. Mass. 2014) (stating that "where a jury finds liability on multiple claims, but only some claims meet the standard of nondischargeability . . . but where the jury does not allocate damages between counts," the bankruptcy court "should make findings about what portion of the jury verdict is attributable" to the nondischargeable claims); *In re Gallagher*, 388 B.R. 694, 704 (W.D.N.C. 2008) (remanding to the bankruptcy court to allocate compensatory and punitive damages awarded in state court between dischargeable and nondischargeable claims where "[t]he proper apportionment of the damages . . . cannot be determined on this record").

[17] The total amount of compensatory damages should be used, including the amount of compensatory damages assessed solely against Todd, because the jury awarded the punitive damages jointly and severally against the Debtor and Todd for all of the claims against them.

nondischargeable debt from his dischargeable debt.

The jury assessed compensatory damages against the Debtor in the amount of $15,000 for Harris' intentional infliction of emotional distress claim related to the Texts and $190,000 for all of the compensatory damages assessed against either, or both, the Debtor and Todd for the Texts and the Defamatory Statements.[18] Thus, the nondischargeable portion of the compensatory damages award against the Debtor for the Texts represents approximately 7.89% of the total compensatory damages awarded to Harris against either, or both, the Debtor and Todd for the Texts and the Defamatory Statements (which is calculated by dividing $15,000 by $190,000). Applying that percentage to the total $500,000 punitive damages award, the Court determines that $39,450 of the total punitive damages award against the Debtor should be held to be nondischargeable.

IV.    **CONCLUSION**

For the foregoing reasons, judgment will be entered in favor of Harris and against the Debtor on Harris' nondischargeability claim against the Debtor under § 523(a)(6) with regard to Harris' $15,000 compensatory damages award related to his intentional infliction of emotional distress claim; and the related *pro rata* portion of the punitive damages equal to $39,450. Judgment will be entered in favor of the Debtor and against Harris on Harris' nondischargeability claim against the Debtor under § 523(a)(6) with regard to the following compensatory damages awards: the $75,000 for the Debtor's defamatory statements about Harris

---

[18] As explained above, the jury awarded compensatory damages in favor of Harris: (1) against the Debtor in the amount of (a) $15,000 for the severe emotional distress suffered by Harris as a result of receiving the Texts; (b) $75,000 for the false and defamatory statements in the Article; (c) $50,000 for the false and defamatory statements made by the Debtor to Kaplan and Blumstein about Harris; (2) against Todd in the amount of $25,000 for the severe emotional distress suffered by Harris as a result of receiving the Texts; and (3) against the Debtor and Todd, jointly and severally, in the amount of $25,000 for republishing the false and defamatory statements in the Article on the internet. *See generally* Compl. Ex. A (setting forth the jury's determinations).

in the Article; $25,000 for the Debtor's republication of the Article on the internet; $50,000 for the Debtor's defamatory statements to Kaplan and Blumstein; $356,486.03 for the Debtor's breach of contract; and the remainder of the punitive damages award equal to $460,550. An appropriate order follows.

Date: August 31, 2017

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge